# First National Bank of Bangor, Appellant, v. Paff.

*Promissory notes—Defenses—Want of consideration—Burden of proof—Evidence.*

1. In an action by the holder against the maker of a promissory note, where it appeared that the note was given in consequence of a dispute as to whether the maker was liable as endorser upon another note of prior date which had been discounted by the holder of the note in suit but had become mislaid or lost, and

where there was evidence to sustain a finding that the note in suit was given in pursuance of an agreement by the holder that the defendant was not to be liable upon it if it should subsequently be discovered that he was not a party to the prior note, and a further finding that the defendant was not liable on the prior note and the jury so found, a verdict and judgment for defendant was upheld.

2. In an action by the holder against the maker of a promissory note, where the plaintiff makes out a prima facie case by presenting the note and the defendant submits testimony showing a want of consideration, the burden shifts to the plaintiff to satisfy the jury under all the evidence in the case that the note was founded on a valuable consideration.

Argued March 10, 1913. Appeal, No. 259, Jan. T., 1912, by plaintiff, from judgment of C. P. Northampton Co., Feb. T., 1911, No. 52, on verdict for defendant in case of First National Bank of Bangor v. Alfred M. Paff. Before FELL, C. J., BROWN, MESTREZAT, ELKIN and MOSCHZISKER, JJ. Affirmed.

Assumpsit upon a promissory note. Before STEWART, J.

The opinion of the Supreme Court states the case.

The note in suit was as follows:

                                                  No. 86892
No. ........          Bangor, Pa., Feb. 2, 1910.
                                     Due May 2.
. Three months after date I promise to pay to the order of A. M. Paff                                    $2,000
          AT FIRST NATIONAL BANK OF BANGOR, PA.
Two Thousand ............................ Dollars
Without defalcation value received with interest.
     Credit the drawer.          (Signed)    A. M. PAFF.
                    (Endorsed)
               A. M. PAFF.

When defendant, A. M. Paff, was on the stand, the following questions were asked him:

."Q. Well, did the committee subsequently come to you?.

"A. The committee subsequently called upon me and finally asked me to come to Mr. Thomas Ditchett's office, where Mr. Buzzard and Mr. Dichett were—

"By Mr. Goldsmith: We will follow this up by showing that a committee was appointed and actually waited on him.

"A. The committee called upon me to look into this matter. At that meeting, I denied that I was liable on this note.

"Q. At the time of the committee meeting?

"A. Yes, sir. They finally said, that, in order to avoid any further dissension and discussion, I should give a note of $2,000 and if it afterwards developed that I wasn't liable on this I should never be asked to pay for it.

"By Mr. Kirkpatrick: This evidence as to what took place in any conversation by the members constituting the committee is immaterial and irrelevant, the committee having no power to bind or make any arrangement upon the subject, but simply to report, upon which subsequent action might or might not be taken; and it appears that there were minutes of the meeting of the board of directors, relating to this subject, which are the best evidence of what took place between the bank and the witness so far as it has any relevancy to this present controversy.

"By the Court: In the absence of the minutes, we will go on with the examination as before and when they are produced and we have an opportunity to read them, we will make such change in the ruling, if any is necessary, to protect the rights of the parties. For the present, the objection is overruled.

"Exception and bill sealed for plaintiff. (6)

"Q. In consequence of the interviews and conversations that you had with Mr. Ditchett and Mr. Buzzard, as the committee of the bank, you gave that note?

"By Mr. Kirkpatrick: Objected to as incompetent and irrelevant, and it simply forms a mental conclusion

on his part.   The circumstances under which the contract was made and the sequence must be determined by the facts themselves as they transpired, of which the proper evidence should be given.

"By the Court:  The objection is overruled.

"Exception, and bill sealed for plaintiff.

"A. I will have to answer it, yes, sir.  (7)

"Q. Then, Mr. Paff, will you state again, were you indebted on account of this note or was there any consideration passing from the bank to you at all for the note in suit?

"By Mr. Kirkpatrick:  Objected to as incompetent and irrelevant, and that proper proof should be given of the existence of any such note or series of notes, and that the witness is not competent to answer a question of that kind at this time, in the absence of such notes, which are assumed, in the question to have been in existence or claimed upon.

"Objection overruled.

"Exception, and bill sealed for plaintiff.

"A. There was no consideration." (8)

*Errors assigned* were (1, 5) various parts of the charge; (6, 8) rulings on evidence, as above, quoting the bill of exceptions.

*Kirkpatrick* and *Maxwell,* for appellant.

*Aaron Goldsmith,* for appellee.

OPINION BY MR. JUSTICE BROWN, May 5, 1913:

But little need be said in affirming this judgment. Whether the appellee was liable on the note which he gave to the appellant and upon which this action was brought, depended upon a single and very simple disputed fact.   The defense was want of consideration, and upon that theory the case was tried.   This was the issue raised by the pleadings, for, in his affidavit of defense, or

answer, as it is styled, the appellee's distinct averment was that his defense was want of consideration; and to this the appellant filed its replication. The defense made at the trial was want of consideration. Neither failure of consideration nor contradiction of a written instrument by parol was for the consideration of the court in submitting the case to the jury, and the elaborate brief of counsel for appellant is not to be regarded as applicable to the real controversy between the parties, which is apparently misapprehended.

On February 2, 1910, the date of the note given to the bank by the appellee, he was its president. For sometime prior thereto the cashier had insisted that he was liable as endorser on a note of an insolvent corporation for $2,000, dated January 23, 1904, which had been discounted by the bank, but was mislaid or lost. Paff, the appellee, denied this liability, and on January 25, 1910, at a meeting of the board of directors of the bank, a committee, composed of two of them, was appointed—one selected by the bank and the other by the appellee—to inquire into the liability of the appellee upon the said note and report to a subsequent meeting. As a result of its investigation, this committee concluded that the appellee was liable on the said note, and, at an interview with him, so informed him; but on his persistence that he was not liable, both members proposed to him that he give a note for $2,000, upon condition that, if upon subsequent investigation, it should be found he had not been a party to the note of January 23, 1904, he would not be liable on the note they asked him to give. One of the members of the committee was dead at the time of the trial, but the other, who had been selected by the bank, testified as follows: "Well, at the meeting in Ditchett's office we suggested that Mr. Paff would give a note for the $2,000 and settle this controversy, and if at any time in the future it was determined he was not liable on the original note, that we wouldn't insist on the payment of it." On February 1, 1910, the committee made report to

the board that in their judgment the appellee was liable on the note of 1904, and, according to the testimony of the surviving member of the committee and Adolph Smith, another director, when the report was made to the directors it was stated—Paff being present—that if it should be subsequently determined that he was not liable on the note of 1904, he would not be held on the note in suit. The following was the testimony of the surviving member of the committee: "It was said at the board meeting, that if Mr. Paff wasn't liable on the original note, we wouldn't insist on the payment of this note of $2,000"; and Adolph Smith, the other director, testified that Paff agreed to give a note for $2,000, with the understanding that, if it was discovered that he did not owe the note of 1904, he should not be asked to pay the obligation. Paff testified that he gave the note in pursuance of his understanding that he was not to be liable upon it if it should subsequently be discovered that he had not been an endorser on the mislaid or lost note. The verdict of the jury conclusively established the fact that the note in suit was given in pursuance of an agreement by the bank that the appellee was not to be liable upon it if it should subsequently be discovered that he was not liable on the prior note; and the jury found that he was not liable upon it. There was, therefore, no consideration for the note in suit.

On the case as presented by the plaintiff in rebuttal, the jury might very fairly have found against the appellee, on the ground that the note had been given by him without condition in settlement or compromise of a disputed claim, but it was for them to pass upon the controverted question of fact upon which the liability of the defendant turned. By presenting its note the appellant made out a prima facie case. After the defendant had submitted testimony showing a want of consideration, the burden shifted to the plaintiff to show a consideration, and the learned trial judge committed no error when he charged the jury that, after evidence had been

oughfare under our statutes. The owner can do what he chooses with his own land. He may sell and convey it as an entire tract, or he may sub-divide it into a plan of lots, showing streets and alleys, and when he has done so, the law says there is an implied covenant to dedicate such streets to public use, or at least to the use of all lot owners and as a necessary incident the use of the public; but this covenant amounts to nothing more than a contractual relation between the interested parties and their successors in title, that such streets shall not be closed, or appropriated to a different purpose, or be diverted to a different use by the grantor, or anyone holding title under him, or by any other person exercising simply the rights of an individual owner or purchaser. But all of this is only a matter of contract between private parties and the public use is but incidental to the private right. It is not within the power of a land owner by grant or otherwise to impose a public highway upon public authorities without their consent or against their will. It is true that the public has the right of passage over a street dedicated to public use by the proprietor of a plan of lots for the benefit of lot owners, but this right is a necessary incident of the grant and does not exist independent of it. By such dedication the grantor covenants with his grantees that the dedicated streets shall remain open forever not only for the use of all lot owners as a means of ingress and egress to their properties, but for the use of the public desiring access thereto. The public use adds value to the private right and this may be fairly said to have been in contemplation of the parties to the covenant. The lot owners have the right to insist not only on the use of the street for their own purposes, but that the public shall have the same right to make use of it. All of which is intended as a benefit to the lot owners and not as an independent right in the public. The rights both of the lot owners and the public are founded in the contract of the parties and arise no higher than

their covenants imply. Such a covenant imposes no duties upon the public authorities unless they choose to accept the tendered easement and adopt the dedicated streets as public highways. Even if such streets be adopted by the municipal authorities, they may subsequently vacate them, and when this is done, the lot owners and all other interested parties stand upon their contractual rights whatever they may be. These are rights of property in the lot owners and it has been so decided in numerous cases. In Paul v. Carver, 24 Pa. 207, it was said: "A private road is private property." In re Melon Street, 182 Pa. 397, this court, speaking through the present Chief Justice, stated the rule as follows: "The owner of land fronting on a highway has an additional interest which must be regarded as property and which, when the right to recover has been given by, the State, will sustain a claim for compensation. Such an owner, where the street has been laid out or established by his grantor, is a purchaser by implied covenant of the right that the street shall remain open, and the vacation of the street by the municipal authorities will not divest his right to have the space left open as a street. This private right of way as appurtenant to the land is wholly distinct from the public right of passage." This means that the easement in the street is appurtenant to the land of the lot owner and is therefore a private right of property in him. In the very recent case of O'Donnell v. Pittsburgh, 234 Pa. 401, Mr. Justice MESTREZAT gave expression to the same thought in the following language: "The easement over the streets is appurtenant to every lot and becomes a property interest in the purchaser of the lot which may be protected by appropriate legal process." So, too, in Carroll v. Asbury, 28 Pa. Superior Ct. 354, it was held that the purchasers of lots sold according to a plan showing streets, alleys and courts, acquire a right of property appurtenant to the lots, in the use of the streets, alleys and courts, thus dedicated. Such

a right is sometimes called an "easement of access" which means the right of ingress and egress to and from the premises of the lot owners. It is a property right appurtenant to the land which cannot be impaired or taken away without compensation: Ferguson v. Railroad, Etc., Company, 108 Ky. 662. An easement in a street or other highway appurtenant to an abutting lot partakes of the nature of land. It is a part of the lot to which it is appurtenant and passes to a purchaser with a conveyance of the lot: B. & O. Railroad Co. v. Lersch, 58 Ohio 639. The grant of an easement is always made for the benefit of the premises to which it is appurtenant and passes to each succeeding purchaser as a right of property annexed to the premises described in the grant: Wagner v. Hanna, 38 Cal. 111. These and numerous other cases not cited clearly show the trend of judicial decision to be that in cases of this character the grantee of a lot sold according to a plan on which streets and alleys are plotted by a private owner acquires a right of property in the easement over the streets of which he cannot be deprived without compensation. But that this is a private right of property in the lot owner and not a public right of passage existing independently of the grant, must be considered as settled law in our State.

With this understanding of the law what are the rights of the parties to the present controversy? The railroad company has undertaken to do nothing in violation of law. It is acting clearly within its charter powers. It is not only acting within its charter powers in improving and extending its lines, but it has undertaken to eliminate dangerous grade crossings in the interest of public safety and in compliance with repeated decisions of the courts on this question. The public authorities have given their consent to the proposed extension and improvements and have prepared the way by vacating so far as the public have any rights in the matter, except the incidental right of passage dependent upon the pri-

vate grant, the two streets in question. No one representing the public is here complaining, and since the public authorities have renounced all rights in the vacated streets, the only parties left to complain are the individual lot owners whose property rights may be affected by the taking. If by the taking their property rights are injured they may demand compensation, but they cannot deprive the railroad company from properly exercising its powers under the right of eminent domain on the ground that it is obstructing a public highway. Stewart street and Fifth avenue are no longer public highways. It must be conceded that the railroad company could condemn the lot of appellant to which the easement in the dedicated street is appurtenant. It would seem to necessarily follow that if the land itself can be condemned, that which is appurtenant to it may also be the subject of condemnation. This view was very aptly expressed in Philadelphia, Wilmington & Baltimore R. R. Co. v. Williams, 54 Pa. 103, by Mr. Justice AGNEW as follows: "It is difficult to understand how a right to enter upon land, and locate and construct a railroad thereupon, can be arrested by the existence of an incorporeal hereditament issuing or served out of it. One would suppose that in taking the land the way itself is taken. Omne majus continet in se minus seems to forbid any other conclusion. If the land itself which supports the way can be taken, I can see no reason why its incident, the right of way over it, is not equally affected by the same taking for the use of the public." It is true the facts in that case were not the same as those in the case at bar, but the power not only to condemn land which is corporeal but also a right of way which is incorporeal is clearly recognized. We must, therefore, conclude that the railroad company in the present case under the right of eminent domain can condemn the easement of appellant in the vacated streets. If by the condemnation the land of appellant was injured there should be compensation if any in-

submitted to them sufficient to rebut the prima facie consideration imported by the note itself, the burden was upon the plaintiff to satisfy them, under all the evidence in the case, that the note was founded on a valuable consideration: Conmey v. Macfarlane, 97 Pa. 361.

In support of the defense set up the testimony complained of by the sixth, seventh and eighth assignments was properly received. All of the assignments are overruled and the judgment is affirmed.